Our first case for this morning is St. Vincent Randolph Hospital v. Secretary of Health and Human Services, Thomas Price. Mr. Smith.  This case involves a claim for Medicaid reimbursement for interest expense that St. Vincent Randolph incurred on the construction of a new hospital facility in Winchester, Indiana. There are two issues presented this morning, Your Honors. Number one, whether the original 2002 loan that was made between St. Vincent, Indianapolis and St. Vincent Randolph, their related hospitals, whether that loan was paid off by the bond purchase proceeds that the Ascension Bond Program provided in 2003. The second issue presented is whether any defect in the original 2002 loan precluded the interest expense on the refinance debt through Ascension Health. In other words, the second issue is basically a once-tainted, always-tainted. It is the government's position on that issue that the original 2002 loan was insufficiently documented and was related between related parties, and therefore that was tainted. Well, maybe we should separate the idea of taint from documentation because if the documents aren't sufficiently detailed to see what that 2002 loan was, what were its terms, what was the interest, what was the repayment record, and then if at the later time when the bond issue, the Ascension apparently floats, is issued and Ascension, according to you, gives the $15.5 million or so to St. Vincent Randolph and they somehow transfer that amount, and these numbers I'm actually having a lot of trouble with since with the amortization table you're looking at it's not clear why that's the right amount of money, but basically as I read the district court's opinion, it doesn't preclude the theoretical possibility that something like this would have been reimbursable, but it does say you just didn't present the documents. That's correct, Your Honor. They're claiming a defect, and I agree. Right, so in other words, they're not saying there's some eternal once-tainted, always-tainted rule or anything. So it's a more modest claim, right? Yeah, I think that's true. I think basically they're claiming that the document was incorrectly or inadequately documented. So tell us about the documents then. Tell us about what in the 2002 transaction documents the loan from the Indianapolis, I guess we're calling these things all different names, but St. Vincent Indianapolis, what documents that loan? Well, basically it was an amortization table and some other journal entries. But tell me why an amortization table documents a loan. Why is that something that memorializes the loan? Well, it shows the interest payments down to a zero balance is what it does. Right. I think the situation is here is that they are related entities, and they are jointly controlled by a central bank. Which was a problem in 2002 before. Correct. So you agree with that too, and I guess that's why you dropped your interest claim. That's correct, Your Honor. So your entire documentation for the 2002 loan is the amortization table? Yes, and I believe there may be some other journal entries in the record, but essentially that's documentation that was put in. So when I read the regulation, it looked as though the government wasn't being rigid. They weren't saying, you know, you had to have a piece of paper that said loan agreement at the top of it. They recognized that, as is often the case in the business world, there might be exchanges of correspondence that would say, we're proposing this, that's okay with us, you know, we're going to do that. Or even emails, but there's nothing like that in this record. There's not, Your Honor. That is, in fact, why that claim for 2002 was dropped. All right. So tell me about the documentation then for the proposition that after Ascension floats the bond issue, they collect the money, then they give $15 million and a half or so to the St. Vincent Randolph people, who then give it to the St. Vincent Indianapolis people. You've given us some little excerpts from tax returns and stuff, but there's a lot of inference that has to go on there. Why is the Secretary being unreasonable in saying that he wants more? Well, I don't know that the Secretary is being unreasonable by saying that they want more. The question is what more – Well, doesn't that dispose of your case? No, I think what is at issue here is what's required by the regulations, by the – Doesn't the regulations say that the documentation has to be documentation satisfactory to the Secretary? That's true, but I don't think – Okay. And so in response to the Chief Judge's question, you said the Secretary was not acting unreasonably. Well, if you put those two things together, there's something of a problem for your appeal. Well, I think what I'm trying to say is that there's nothing unreasonable for asking for additional documentation, and that's just exactly what they did before the PRRB. What I think is unreasonable here is the quality of the documentation that they are demanding. There's nothing in the regulations that require that a written satisfaction or a written release of the loan be presented in order to establish that the loan was repaid or that it was somehow not – Why is there a fight over that if that's what this is about? And I'm going to ask the Secretary's lawyer as well. Why is there a fight? St. Vincent, Indianapolis can create that on the back of an envelope in less than 30 seconds. Do we really have a full set piece of litigation about something that's so easy to create? Well, I think the problem here, Your Honor, is that what the Secretary actually did in this case, this is not something that grew out of a full-blown, properly promulgated regulation. This is something that grew out of the fact that there was never any issue about the – Wait, wait. Now I'm lost. You said this does not grow out of a properly promulgated regulation. Are you making a procedural challenge to the validity of the regulation? Well, I don't think there is any regulation that requires a written release or satisfaction. No, it doesn't require a particular document. And it requires documents satisfactory to the Secretary. Are you saying that that regulation is invalid for some reason? I heard you say it wasn't properly promulgated. No, correct. I'm not saying that regulation wasn't properly promulgated. Then what is it in your view that wasn't properly promulgated? The Secretary is attempting to write into that regulation the requirement for a written release. I don't think that's quite right. I think that what the Secretary ultimately decides – and this goes through all the regular steps of the adjudicatory procedure that the Department makes available. The Secretary is saying something different. What you gave me isn't enough. I don't see the Secretary actually saying, and only the following formal documents will be enough. I'm not sure the Secretary ever had to get there in this case. But the Secretary is quite unsatisfied, as it seems from this case, with what you did proffer. And I don't think necessarily had to play a game of 20 questions to figure out, well, is this enough? Is that enough? You gave them your documentation. I see where you're coming from. I can see where these monies shift back and forth or these very similar amounts shift back and forth. But the Secretary didn't think that – I guess the Secretary's posture is there's some distance between what you gave and the formal written release, et cetera, crossing the Ts and dotting the Is, which he didn't see in this record. So I guess what – I take it from your answers to Judge Easterbrook, you're not saying that a regulation that says documentation has to be acceptable to the Secretary is somehow so vague that you don't understand it. It's, in that sense, invalid. You recognize you have to give the Secretary enough. I do, and I think we did, Your Honor. That's the real issue here. I think we gave him – So you would like us to override the Secretary's judgment. But that's where I'm bumping into the standard of review here. We're not just one more layer of HHS review. I understand that, Your Honor. But I also believe that there's no doubt that there's deference that's accorded to the Secretary's decisions. There's no doubt about that. But that doesn't preclude a probing and thorough review of that decision and the basis for the decision. That completely loses me. Our standard of review is substantial evidence, which is about as far from probing and thorough review as one could imagine. Could you just explain in short compass why the Secretary's decision is not supported by substantial evidence? Well, I think the Secretary's decision is not supported by substantial evidence because the only evidence presented in this case is, number one, that the loan was always intended to be a short-term loan between the two parties. Secondly, the only evidence presented, and that was in the testimony of Mr. Warden and Mr. Ellison, was that this loan was paid off. Now, that's not just testimony without any documentary support. The documents that we did put in the evidence were contemporaneously prepared at the time of the transactions, and this was just testimony that was put forth by Mr. Warden and Mr. Ellison, indicating that that is, in fact, what those documents did. And that's what, in fact, occurred. The Secretary didn't accept Your brief sets out, at pages 17 to 19, the documents that you think support your position.  Well, I don't think that I'm saying they must accept it, but I think that doesn't preclude a challenge. If you're not saying that, I don't see how you have any leg to stand on. As I see it, unless those things at 17 to 19 are adequate as a matter of law to override any discretion the Secretary possesses, then there's nothing here to argue about. And you just answered my question by saying you're not contending that, and that leaves me at sea about what the core of your position is. I understand that, Your Honor. I see that I'm getting into rebuttal time, so I'll end it there. Thank you. All right. That would be fine. Mr. Lee. May it please the Court. Good morning, Your Honor. My name is Chung Han Lee on behalf of the Secretary of Health and Human Services. As the Court has correctly pointed out, this case is about St. Vincent Randolph's fatal lack of documentation to support the legal propriety of its claim. Counsel, what documentation was missing? What more was needed in the Secretary's view? They needed an original written agreement, evidence of a loan agreement for the original 2002 loan. Now, that's the taint argument, and I don't think you'll find much support on this panel for the taint argument, and the District Court expressly rejected it. So if you ignore the taint argument, what extra documents does the Secretary think are needed? Your Honor, I do think that an agreement setting forth the terms of the 2002 loan. No, that's the taint argument. Put that to one side. What extra documents are needed for the proposition that the bond issue is being used to finance the hospital? To just underscore that point, is there any way you can read the evidence in this record that would shake your confidence that the bond issue money that Ascension raised and then gave to St. Vincent Randolph was being used for an appropriate purpose under the Medicare program for the construction of the hospital and whatever ancillary equipment or the like goes along with constructing a hospital? Is there anything to make you think that people were off building shopping centers with that money or doing something inappropriate? There's nothing in the administrative record that would suggest that, Your Honor. And you'll agree the numbers match up quite well, although it's a little bit difficult to see if they really were amortizing the loan. They got a million dollars more than they needed to pay off. There's a few quirks like that in this record. So the Secretary agrees that the money that Ascension raised and gave to St. Vincent Randolph was, in fact, money for Medicare-approved purposes? Not to the extent that St. Vincent Randolph can claim interest expenses on those loans. So is it, in fact, the Secretary's position, as Mr. Smith was suggesting, that only a formal agreement signed by all parties, et cetera, that lays out, you know, here's the amount of the loan and here's what the interest rate is going to be and here's all the rest of this stuff, only that will do and nothing less? I think that such a document would allow us to make the proper link between the 2002 loan and what they contend, the 2003 bond debt that they contend was refinanced. Well, you need that link only to correlate the later money with the hospital. Otherwise, the earlier loan doesn't make any difference, right? You need to show that whatever it is, you know, $15.5 million, is for the construction of the new hospital facility. It's also the case that if you take the 2003 bond debt standing alone without any relation to the earlier loan, then there's also a question as to whether it would be, quote, unquote, necessary under the regulations. The 2003 loan or bond debt would not be. Counsel, I'm lost now. The Secretary, as I understand it, did not deny the reimbursement request on the grounds that the money was unnecessary, that the spending was improvident, that they didn't need to borrow or anything like that. Did I miss something in that decision? Well, the 2000, I mean, that was not specifically laid out in the administrator's decision, but it was. Well, then it isn't under shenari, then it isn't an issue in this case. We can affirm an administrative decision only on the ground given by the agency. The administrator did find that it was not a necessary, that they had not established that it was necessary. Because the 2003 bond debt was not necessary for the operation, maintenance, or acquisition of the facility. Were they taking the position that it wasn't necessary because by this point the new hospital had been built? Yes. So there is already a new hospital financed however it was financed. They don't care. And they're saying, why do you need another $15.5 million? Correct, Your Honor. That's why it would not be. And the answer is to pay back the money that we borrowed to build this new hospital. Which was insufficiently documented in the first place. Could you repeat that? Which was insufficiently documented in the first place. So that's how you're trying despite the rejection of the taint argument to say, are you actually saying we don't know whether it cost you $10 million to build the new hospital, or $8 million, or $25 million, or $15.5 million, or whatever? Is that your position? As of 2003-2004 when we're talking about the As of 2003-2004 the bond debt was not being used to acquire a facility. The hospital already had that facility. So are you saying that as a matter of law all interest on refinancing is disallowed? That's what it sounds like you're now arguing. If the first loan had been documented to the nines and had been not from an affiliate corporation but from JPMorgan Chase, and had been a $15 million loan to build the hotel, and then that loan is taken out by a second loan of equal size from a different source, it sounds like you're now arguing that all interest on the second loan would be disallowed because it wasn't necessary to build the hospital. It was only necessary to repay the first loan. Is that the Secretary's position? No. Indeed not. But it is the argument you're making on your feet, and it doesn't seem a very good one, I must say. If there is a proper link between that latter refinance loan to the earlier loan. Oh, no, that's just back to the taint argument. Mr. Lee, can you point to anything in the record that misled the Secretary in this transaction? Because isn't at base what you're concerned about is that the Secretary, in carrying out the policy of the department, is fully possessed of whatever he or she, in this case, he needs. So is there anything to indicate they misled or misread what was presented? I don't want to get tied up with inadequate documentation. Sure, that's fine. There's not, I do think within this record, for instance, the increase in the loan amount for the 2003 bond finance from the earlier, that was not documented. We do not know how that was spent. We do not know whether that was for patient use. And there's nothing in the document to support what this additional amount is. So the Secretary couldn't be convinced that it all went for brick and mortar. Is that your argument? That is part of my argument. I want to follow up maybe a little bit on that and see if what you're saying isn't so much that it's bad documentation from the first loan, but that if the first tranche that you're now refinancing had been spent on building an elaborate country club, you wouldn't have allowed interest on that refinanced loan to be deducted. If the first loan was actually used to build a new hospital, then you would allow the interest on the refinancing. So it's not about whether it's refinancing or not. It's about whether the first loan is for legitimate purposes. Yes, Your Honor. Actually, I'm not sure what in the record would suggest that it wasn't. But if the documentation issue goes to which refinancing is okay, at least it's not a position saying no refinancing is okay. Because people refinance all the time for interest changes. Sure. I mean, I would suggest offer that the Secretary would probably object to a refinancing if the refinancing was for a higher interest rate. There would be no reason for the refinance. And we would not, in order to protect the Medicare trust, we would not, you know. Hard to see why somebody would want to do that. Right, exactly. Hard to see why anybody would want to do that. But if for whatever reason, we would probably object to that as well. So is it reasonable for the Secretary to wonder whether that first $15 million was for building the new hospital facility? Nobody seems to be contesting that the facility that the hospital had when the St. Vincent people took it over was an 80-year-old clunker of a hospital that needed replacement. Well, that wasn't that issue. No, everybody agrees that that's true, right? It's not, in fact, an issue. So I guess we just need the precision about what it is that's wrong with this that should cause us to defer to the Secretary's assessment of the adequacy of the documentation. I think the precision comes in the discrepancy in the amounts from the original loan to the refinancing. So the $1 million that I was talking about, because amortized, it should have been down to about $14.5. Exactly. It starts out at $15.5. So the money that comes in from the Ascension people is back up at the $15.5 level with another million thrown in there. Exactly. Yeah. Well, that, Counsel, it seems to me that that problem might justify disallowing interest on the extra $1 million. Why does it justify disallowing interest on the $14 million that seems to be a refinancing of the original debt? Because, Your Honor, as this court's decision in Davies County Hospital, we're in a similar situation where there was a lack of documentation as required by the Medicare regulations and the PRM, where they're not able to establish or provide the documentation sufficient. No, no, no. Look, let us assume that the documentation shows that the refinancing was for $15.5 million, which was $1 million more than the $14.5 million debt. The question is, what is the right thing for the Secretary to do to disallow interest on the whole $15.5 million or to disallow interest on the extra $1 million, which doesn't seem to have been used to take out the original loan? Which is the right thing to do and why? That's what I'm asking you. I think the right thing to do is to disallow the full amount. And why? Because, again, I understand the court is adverse to the taint argument. The original $14 million was also not properly documented. Yep, that's the taint argument again. As the other side has conceded. Can you answer my question without reasserting the taint argument? Is it taint or is it underlying substance, I'll ask you? Because, I mean, you could answer the question as if the first loan, as Judge Easterbrook suggested a few minutes ago, was perfectly documented. J.P. Morgan Chase. Yeah, right, no related parties or anything. Presumably the Secretary would have looked at such a loan and wouldn't have had a documentation problem with it, but might have had a medical necessity problem with it, might have had some other substantive problem under the Medicare Act. Yes, that's correct, Your Honor. Okay. All right, well, if you would like to sum up, feel free to do that. So, in summary, Your Honor, I think, again, St. Vincent Randolph is not entitled to the interest expenses it seeks here. It's failed to properly document its purported loan with St. Vincent, Indianapolis, and as required by the Medicare regulations, to recover interest expenses. It also failed to document and establish a link between the 2003 bond debt and the original 2002 loan. And that's demonstrated, again, as the Court has pointed out, in the discrepancies between the loan amounts and St. Vincent Randolph's failure to explain these differences. There's substantial evidence to support the Secretary's decision, and we respectfully request that the panel uphold the District Court's decision. All right, thank you very much. Anything further, Mr. Smith? All right, thank you very much to both counsel, then, and we will take the case under advisement.